### F. ALDERETE GENERAL CONTRACTORS INC.

v.

### The UNITED STATES.

### No. 142–83C.

United States Claims Court.

Jan. 30, 1984.

Thomas A. Spieczny, El Paso, Tex., for plaintiff. David Churchill, C. Stanley Dees and McKenna, Conner & Cuneo, Washington, D.C., of counsel.

Michael T. Paul, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

MEROW, Judge:

In this litigation plaintiff seeks to enjoin the performance by another company of a contract awarded by the U.S. Army Corps of Engineers in March of 1983 for the construction of the Keystone Outlet Conduit project located in El Paso, Texas. The prior dismissal of this case for lack of jurisdiction, 2 Cl.Ct. 184 (1983), was reversed and the matter remanded "with instructions to hear and determine Alderete's claim for equitable relief on the merits." *F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476 (Fed.Cir.1983).

Accordingly, in compliance with the mandate of the Court of Appeals for the Federal Circuit, a trial was held in this matter in El Paso, Texas, at which time substantial documentary evidence was introduced, together with testimony from 15 witnesses comprising over 1,000 pages of transcript.

Upon the evidence of record it is concluded that plaintiff has not established a valid basis for the relief sought.

### FACTS

The Keystone Outlet Conduit contract is one segment of a flood control project for the city of El Paso, Texas and vicinity. The contract requires the underground placement of 9,400 linear feet of 96″ diameter concrete pipe designed to transmit water from a dam, to be constructed under another contract, to the Rio Grande River.

As originally contemplated in 1981 the Outlet Conduit contract was the initial project, to be followed by the contract for the dam. Because the Corps of Engineers then concluded that the size and complexity of the Outlet Conduit project and the specialized work involved precluded a set-aside of the procurement for a small business, in the spring of 1981 specifications were prepared for an unrestricted advertised contract. Bid opening for the conduit contract was originally scheduled for September 15, 1981.

Alderete, at all times relevant to this litigation, has been a so-called "8(a) contractor," a corporation designated by the Small Business Administration (SBA) as a "socially and economically disadvantaged small business concern." 15 U.S.C. § 637(a)(4), (5), (6) (section 8(a) of the Small Business Act); 13 C.F.R. § 124.1–1(c). Under the 8(a) contract program, 15 U.S.C. § 637(a)(1)(A), a federal agency contracts with SBA for the performance of required work. SBA locates a qualified small busi-

ness and the terms and conditions of the contract are then negotiated. 15 U.S.C. § 637(a)(1)(C). *See Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696 (5th Cir. 1973).

Alderete had, prior to September of 1981, contacted a number of SBA and Corps of Engineers officials in an unsuccessful attempt to have the Outlet Conduit project awarded to it as an 8(a) contractor. On September 1, 1981 Alderete filed suit in the United States District Court for the Western District of Texas to enjoin the September 15, 1981 opening of bids on the Outlet Conduit project. A delay of the bid opening was ordered by agreement of the parties. The court determined that it had subject matter jurisdiction under 28 U.S.C. § 1331. On December 15, 1981, after a trial, the court entered a judgment setting aside the Corps' decision to let the Keystone Dam Outlet Conduit project on an unrestricted basis without consideration as to whether any individual 8(a) contractor was capable of performing the work. The court also enjoined the previously scheduled bid opening and ordered that the Corps of Engineers offer the project to SBA under the 8(a) program. The judgment further provided that "the Army Corps of Engineers, its officers, agents, servants, and/or employees be, and they are hereby, ORDERED to determine the acceptability of any 8(a) contractor(s) that the Small Business Administration may propose to the Corps as qualified to perform the work required on the Keystone Dam Outlet Conduit project."

On April 26, 1982 the Albuquerque district Corps of Engineers requested by letter that the Dallas region, Small Business Administration, advise "if you can nominate a potential 8(a) contractor for this project [Keystone Dam Outlet Conduit]." In June of 1982 F. Alderete General Contractors, Inc., after a selection evaluation, was so nominated by SBA.

Because the Outlet Conduit contract was to be negotiated, as opposed to an award on the basis of advertised bids, and was subject to the Truth in Negotiations Act, 10 U.S.C. § 2306(f), it was necessary for Alderete to prepare detailed cost and pricing data and submit a contract pricing proposal (DD Form 633). The Corps of Engineers also was required to prepare a detailed estimate of the contract cost for use by the government negotiators in reaching a fair and reasonable price in the ensuing negotiation process. Under the applicable procedures, the Corps of Engineers' estimate was not to be disclosed to the prospective contractor. A copy of the government estimate was furnished by the Corps to SBA to assist that agency in carrying out its function of providing guidance to the nominated 8(a) contractor. SBA was, however, also precluded from disclosing the government estimate to the contractor.

Alderete's proposal for the Outlet Conduit contract was submitted on August 31, 1982 and the government estimate was completed at the same time. Alderete's proposal price was $5,267,557, whereas the government estimate, including profit, was $4,200,000. Alderete's proposal was premised upon laying 6 lengths of pipe per 10-hour day, while the Corps of Engineers' estimate was premised upon laying 8 lengths of pipe per 8-hour day. The specifications for the contract, as prepared by the Corps, allowed 500 days to perform the work and Alderete's proposed rate of progress encompassed this period. The government estimate contemplated a somewhat shorter period of actual work time with a resulting cost savings in items such as labor, equipment rental, dewatering the site and overhead. The 500 day performance time had been carried over from the specifications for the enjoined 1981 advertised contract and, in that prior procurement, this period of time had been set forth on the assumption that funding problems and weather could extend the time needed to complete the project.

After receipt of Alderete's proposal the Corps of Engineers prepared a technical analysis dated October 4, 1982 which concluded, in part:

[T]he Contractor's costs appear high on judgmental items. He has used low pro-

duction rates on most of the items thereby increasing all the time related costs.

\*    \*    \*    \*    \*    \*

The contractor has proposed a production rate of 6 joints per 10-hour day. This is not considered reasonable.

\*    \*    \*    \*    \*    \*

Therefore, the one joint per hour rate used in the Government estimate is considered reasonable and should not be reduced. This would allow a placement rate of 10 joints/day.

\*    \*    \*    \*    \*    \*

Overall the Contractor's proposal contains sufficient detail, and with the exceptions discussed above is adequate for pricing purposes.

Prior to the onset of negotiations the Corps of Engineers conducted an audit review of Alderete's pricing data proposal. An audit report dated November 17, 1982 was prepared for use by the negotiators for the Corps. One of the auditor's recommendations was that, in the negotiations, the "overall time frame for excavation, pipe laying and backfill be limited to 6 months with ½ month for weather for a maximum of 6½ months." This time frame would require an average pipe-laying rate of 9 pipe joints per 10-hour day. The audit report concluded that Alderete had submitted cost and pricing data "which may be considered acceptable as a basis for negotiation of a price." The report did include the caveat that this conclusion "should not be interpreted to mean that the data was necessarily accurate, correct and complete in all respects in accordance with PL 87–653, [10 U.S.C. § 2306(f) ] since post award review may disclose evidence not now discernible."

A substantial portion of the proposed contract price consisted of the amount to be paid for the large underground concrete pipe required. Alderete's proposal set forth some $2,133,000 in pipe cost as did the government estimate. Both Alderete and the Corps' estimators had obtained a written price quotation for the pipe from the only feasible supplier, Hydro Conduit Cor-

poration, a company located in Albuquerque, New Mexico, with a branch plant in El Paso, Texas. The price quotation provided to Alderete had been actually delivered by Mr. Bob Holderman, the Hydro Conduit El Paso branch manager, to Mr. Glenn Guy, an official of another construction company who was assisting Alderete in developing its proposal for the Outlet Conduit contract. Mr. Guy's company had performed other contracts with Alderete and Mr. Guy had a financial interest in the equipment rental firm from which Alderete proposed to obtain its equipment if it was awarded the Outlet Conduit contract. Also, Mr. Guy had a long-term business relationship with Mr. Holderman and, for these reasons, Alderete sought and obtained his assistance in developing price quotations from potential suppliers such as Hydro Conduit.

During the period of November 17–18, 1982 the negotiators for the Corps of Engineers contacted Mr. Benjamin (Ben) Snow, the district manager of Hydro Conduit Corporation in Albuquerque, to update material prices and to ascertain if some reduction in the pipe price previously quoted would be possible. Mr. Snow, in turn, checked with his suppliers and ascertained that if a contract to supply the pipe could be awarded by the end of the year, if he could be paid for the pipe as soon as it was produced (less freight), and if the delivery rate would not exceed 12 joints a day, there was a possible reduction in price of approximately $160,-000. Mr. Snow orally informed the Corps personnel as to this possible reduction, but asked that they keep this information confidential as he anticipated the need for a price increase after the first of the year and did not wish to have a reduced price "getting into the street, in the event that the contract was not negotiated and it became an open bidding process."

In final preparation for negotiations, Lt. Col. Julian E. Pylant, district engineer, Albuquerque district, Corps of Engineers, signed a "Memorandum of Objectives" dated November 22, 1982 for use by the Corps' negotiators. This memorandum noted that Alderete's proposal was in the amount of

$5,267,557 and that the government estimate, having been slightly revised, was $4,309,623, including profit. With respect to pipe-laying rate the memorandum stated, in part:

4. The first major item which will be addressed is production rate on the pipe laying operation. Three contractors that are familiar with the project have been consulted concerning a reasonable production rate. All three considered a rate of three 8 ft. joints per hour as a reasonable rate not considering the excavation. The "1982 Dodge Guide" shows a rate of 71 L.F. per 8-hour day. The Government Estimator used an overall average production rate of 64 L.F. per 8-hour day or one 8 ft. joint per hour. Based on a 10-hour day, the Government estimated rate would be 80 L.F. per day. This compares to 60 L.F. [sic—should be "48"] per day proposed by the Contractor. It is estimated that on a project of this length the Contractor can obtain a better than average production rate. In the area where the electric power lines are present, the production rate will be reduced; however, this rate is not expected to affect the overall rate to a great extent. Based on the above, it is the opinion of the estimator that a minimum production rate of one 8 ft. joint per hour be used. It should be noted that the Government estimated production rate is based on a cycled operation consisting of four suboperations. These are excavation, pipelaying, hand backfill, and machine backfill. The hand backfilling operation governed in the Government Estimate. It is also the opinion of the estimator that 8 lin. ft. per hour of the trench hand backfill with a 6-man crew is reasonable.

Based on 80 lin. ft. per day, the pipelaying operation would take 5.3 months. Allow an additional two weeks for lost time and work not concurrent with the pipelaying (excavation at the start and backfill at the end). This would give the Contractor a duration of 6 months. It is estimated that an additional month should be sufficient to allow for mobiliza-

tion and demobilization and site preparation. This would total out to a 7 month operation (some additional time not to exceed 1 month could be allowed for the superintendent).

With respect to the concrete pipe price, the memorandum stated:

j. The purchase price for the concrete pipe on this project is a considerable portion of the total figure. Only two quotes were obtained on pipe which met the specifications. Negotiations were held with Hydro Conduit and a revised proposal will be submitted with stipulation attached for a reduced price. This reduced price is based on computations [sic—should be "competition"] and is considered fair and reasonable.

The procedures applicable to the 8(a) program contemplate that SBA and the nominated contractor will negotiate with the Corps of Engineers as to the terms and conditions for the award of the procurement contract involved. In this regard, Mr. Alderete, the president of F. Alderete General Contractors, Inc., considered that the negotiations would be difficult and requested that a negotiator from the SBA regional office in Dallas, Texas, Mr. Cleo B. (Skip) Styron, be assigned for the Outlet Conduit contract. Although Mr. Alderete intended personally to conduct the negotiations with the Corps of Engineers, he made this request for Mr. Styron's assignment because he had worked with him on several previous negotiations and considered him to be a proficient and experienced negotiator. Also, Mr. Styron had attended the trial resulting in the injunction to preclude the 1981 advertised bid opening for this project and was familiar with the facts and information developed there. The SBA branch office in El Paso concurred in Mr. Alderete's request, indicating a view that the negotiations would be sensitive and "require all negotiation skills that can be mustered, and a lot of diplomacy to effect a successful negotiation." In fact, with the motive of aiding Mr. Alderete in the negotiations, but in violation of applicable procedures, the El Paso SBA office had permit-

ted Mr. Alderete to examine and to photocopy the government estimate prepared by the Corps of Engineers for its internal use, a copy of which had been made available to the SBA. This unauthorized total release of the government estimate necessarily occurred only after the submission by Alderete of its proposal, as the estimate was not completed prior to that time. No previous government estimate had been prepared for this project in 1981 as the litigation to preclude that bid opening truncated the procurement before the estimate, a last-minute task, could be assembled.

After consideration of Mr. Alderete's request for Mr. Styron's assignment as negotiator, the SBA Dallas regional office declined to agree, responding to the El Paso branch office as follows:

Please advise Mr. Alderete that, while we share his perception of the potential difficulties associated with the negotiation of this project, we do not believe that it would be prudent or in his best interests for this office to be involved in the negotiation initially. By remaining non-involved, this office retains a "third party" level of objectivity that will permit you to elevate the case should an impasse in the negotiations develop.

The SBA Dallas region also noted their understanding that the Corps did not intend to utilize as negotiators persons who had participated in the 1981 trial and cited this as another reason not to use Mr. Styron initially. Accordingly, an SBA negotiator was assigned from the El Paso branch office.

Negotiations concerning Alderete's proposal for the Outlet Conduit contract commenced on November 22, 1982 at the Albuquerque district, Corps of Engineers. In a preliminary conference, the district engineer, Lt. Col. Pylant, noted the government's confidence in its estimate and emphasized that, with respect to the differences to be resolved by the negotiators, the pipe-laying rate was the most important factor to be addressed. In the ensuing discussions the pipe-laying rate was, in fact, the major factor inhibiting an agreement on a contract price. The government negotiators asserted that, in certain favorable areas on the site, 24 joints per day would be possible and detailed the operation proposed. By contrast, Mr. Alderete considered his most favorable rate would be 10 joints per day.

Another item of contention was the status of the government estimate. Without disclosing that he had a copy, Mr. Alderete made a continuing demand that the government estimate be disclosed in its entirety, as he considered it to be desirable to negotiate on a line-by-line basis using his proposal together with the government estimate. Citing the applicable procedures, the Corps declined to release the entire government estimate although portions were discussed as a part of the negotiation process. Absent complete production of the government estimate, Mr. Alderete asserted that the Corps was negotiating in bad faith.

After three days of discussions, including some heated remarks by both sides, Mr. Alderete indicated that he could not make the price reductions sought by the Corps and negotiations were recessed at 3:30 p.m. on November 24, 1982 to permit Mr. Alderete to return to El Paso and make a final review of his proposal. It was agreed that a conference call would be placed subsequently to convey the results of this review.

On November 30, 1982 a conference call was placed between the negotiators and Mr. Alderete conveyed the results of computations he had made, assuming an average pipe-laying rate of 10 joints per 10-hour day. Mr. Alderete calculated that this would produce a contract cost reduction of $424,536 which would produce a price of $4,843,021. However, Mr. Alderete considered that additional costs would be required by the reduced time. These additional costs were stated to be: $21,450 for labor; $10,600 for fuel; $25,750 for impact and mishaps; $15,800 for supervision; and $29,250 for Saturday and holiday work. Balancing these additional costs of $102,850 against the $424,536 reduction produced a net reduction of $321,871 to equal a contract price proposal of $4,945,871. Mr. Al-

derete concluded that he could not perform the work at this price since he retained the opinion that 10 joints per 10-hour day was an excessive rate. Mr. Alderete did, however, propose a price of $5,058,065 or, perhaps, to split the difference between this amount and his computed 10 joints per day rate of $4,945,871 to reach a price of $5,002,968. As a final price Mr. Alderete proposed $4,994,995, but Lt. Col. Pylant stated that this was not within negotiating range and that an impasse had apparently been reached.

As a result of continued effort by SBA a further session was convened commencing on December 9, 1982 in Albuquerque. At this session Mr. Styron was assigned as the SBA negotiator. Again, the pipe-laying rate was the main topic of discussion. Mr. Alderete pointed to the 500 days set forth in the specifications and indicated his belief that any reduced time was proposed to prevent him from obtaining the contract. In response, the Corps' negotiators indicated that Alderete could, if it desired, consume 600 days to perform the work but that a fair and reasonable contract price had to be premised upon a reasonable construction period and the 500 days in the specifications was asserted to relate to funding considerations and other constraints. Lt. Col. Pylant did inform Alderete that the government estimate used a placement rate of 8 joints of pipe per 8-hour day and Mr. Alderete again noted his disagreement with this rate. Lt. Col. Pylant explained that the Corps had to have some reason to revise the government estimate and, in his view, no reason had been presented. Lt. Col. Pylant did indicate, however, that a good negotiation figure would be in the range of $4,600,000. After further discussion concerning the dewatering cost for the project, it was agreed that Alderete would contact its subcontractors and suppliers, attempt to obtain reduced prices, and provide a revised price by December 14, 1982.

Among the potential suppliers contacted by Alderete for possible price reductions was Hydro Conduit. Mr. Alderete asked Mr. Glenn Guy to contact Mr. Holderman, the El Paso branch manager for Hydro Conduit, concerning the possibility for a revision in the price for the concrete pipe required. The record contains conflicting evidence as to when this contract between Mr. Guy and Mr. Holderman occurred, but no conflict concerning the substance of the conversation. Mr. Holderman had been present in Albuquerque during the November 17–18, 1982 meeting between Mr. Ben Snow and the Corps' estimators at which time Mr. Snow had indicated that, given certain conditions, a $160,000 price reduction was possible. Accordingly, Mr. Holderman was aware of the price reduction possibility and of Mr. Snow's request that it be kept confidential. Mr. Guy telephoned Mr. Holderman and told him that Mr. Alderete had to go to Albuquerque the next day to negotiate with the Corps. Mr. Guy asked about a possible price reduction and Mr. Holderman told him that there could possibly be a $160,000 reduction but he would not give it to him definitely as that had to come from Mr. Snow out of the Albuquerque office. Mr. Holderman testified that this conversation occurred on December 15, 1982 and that he recalled the date because he, too, had to go to Albuquerque the next day and he, in fact, was on the same flight as the Alderete party the next morning. Mr. Holderman's travel on this date, December 16, 1982, is evidenced by travel documents of record.

In contrast to Mr. Holderman's testimony that he informed Mr. Guy as to a possible $160,000 pipe price reduction on December 15, 1982, Mr. Alderete testified that he received this information from Mr. Guy on December 13, 1982 and promptly utilized the information in calculating a net price reduction to offer the Corps of $140,000. Mr. Alderete supports this testimony with a handwritten note dated December 13, 1982, but not produced prior to the trial of this matter, reporting receipt of a telephone call from Mr. Guy stating that Mr. Holderman "advised him of a reduction in the total of pipe items in the range of upward of $150,000.00 and while he assured us it would happen, he asked that it be confidential." Mr. Guy testified that he made the tele-

phone call to Mr. Holderman on December 13, 1982 and that Mr. Holderman told him he would call back shortly. Mr. Guy further testified that Mr. Holderman did call back on the 13th and provided a reduction of $163,000 which Mr. Guy then gave to Mr. Alderete in the range of $150,000 to $160,000.

On December 14, 1982 Mr. Alderete called Mr. Styron and informed him that he had obtained a reduction in the dewatering cost of $24,000 and that he was going to prepare a best and final position based upon 11½ months construction time. He stated that he had been in touch with other suppliers and that some additional reductions were being developed. °No mention was made of a reduction in the pipe price. Mr. Alderete indicated that his revised offer would use a pipe-laying rate of 9½ joints per day. Mr. Styron advised Mr. Alderete to prepare a detailed revised proposal with underlying pricing data to present to the Corps.

Following the conversation between Mr. Alderete and Mr. Styron on December 14, 1982, a telephone conference was conducted by the negotiators for Alderete and the Corps. During this conference Mr. Alderete reported the $24,000 dewatering reduction and stated that he had contacted the pipe supplier who was working on a price revision. Mr. Alderete revised his construction time to 11 months and noted that he would like to come to Albuquerque on the 15th to present a revised proposal. Lt. Col. Pylant indicated that he would not be in Albuquerque on the 15th and Mr. Alderete then stated a revised price of $4,843,200 and stated that his pipe-laying rate was 9½ joints per 10-hour day.[1] Lt. Col. Pylant eventually proposed a counteroffer of $4,700,000 and requested that Alderete come to Albuquerque on Friday, December 16, 1982 if the company could revise its proposal to $4,700,000 and otherwise Alderete should present a best and final offer. At this point Lt. Col. Pylant notified Mr. Styron that the district had received a com-

munication from Corps headquarters that the government was encountering an appropriated fund problem such that any further obligation of funds may shortly have to be postponed. Lt. Col. Pylant indicated that concluding a prompt agreement on the Outlet Conduit project now carried a high priority.

On December 15, 1982 Alderete received a telephone call from one of the Corps personnel conveying a message from Lt. Col. Pylant that Alderete should not come to Albuquerque on December 16th unless its proposal was $4,700,000. Mr. Styron was informed as to this message and, after consultations with his SBA supervisor and Mr. Alderete, it was concluded that the Alderete negotiators would make the trip to Albuquerque in any event.

On the morning of December 16, 1982 Mr. Styron boarded a flight in Dallas which stopped in El Paso where the Alderete party boarded and then continued to Albuquerque. On the flight Mr. Styron asked Mr. Alderete to show him the revised proposal. Mr. Alderete handed Mr. Styron four documents, one of which was dated November 30, 1982. These documents indicated a proposed price reduction of $424,536 which would produce a price of some $4,843,021. Mr. Alderete also advised Mr. Styron that he had some additional reductions that he was prepared to offer of approximately $18,000. During the trip Mr. Alderete did not mention any reduction in the pipe price to Mr. Styron and the documents shown to Mr. Styron as representing the proposed revised price did not show any reduction in the pipe price as utilized by Alderete in its original proposal.

When the negotiations convened at 9:30 a.m. on December 16, 1982 Mr. Alderete presented a new price of $4,825,000 and Lt. Col. Pylant responded with the Corps' $4,700,000 amount and asserted that there was no room for upward movement in the

---

1. It is noted that the $4,843,200 figure appears to be the amount which Mr. Alderete computed on November 30, 1982 as applicable to a pipe-laying rate of 10 joints per 10-hour day, minus

the $102,850 in additional costs which were then stated to result from performance at the increased rate involved.

government's position. The sheets of paper shown to Mr. Styron on the trip to Albuquerque were presented and discussed with the conclusion that they were inadequate in that it was not possible to make any judgments as to where some of the reductions or add-ons occurred. Mr. Styron suggested that a summary sheet could be prepared, keyed to the original proposal, and the meeting was recessed at 10:30 a.m. to allow this preparation. At 1:15 p.m. Mr. Alderete presented a summary sheet showing changes in the bid items and the government negotiators then proceeded to review this sheet. When the meeting was reconvened at 1:45 p.m. the government indicated that a price agreement could be reached if Alderete would agree to three direct cost reductions: $32,000 from dewatering; $40,000 from pipe laying; and $40,000 from borrow. The Alderete negotiators then discussed this situation in private with Mr. Alderete still expressing reservations concerning the pipe-laying rate involved, but finally concluding that if the government would not split the remaining price difference he would take the contract at $4,700,000. Mr. Alderete stated that he would have to accept the reduction out of anticipated profit. Mr. Styron was initially concerned about any such possible profit reduction, but after checking profit statistics with his office by telephone, he ascertained that the resulting amount was still well within applicable guidelines. Mr. Styron was also concerned about several comments made over the course of the negotiations that the pipe price given by Hydro Conduit was subject to escalation in that a quotation was only good for 30 days. Accordingly, because the pipe cost was a substantial part of the contract price, Mr. Styron suggested to Mr. Alderete that, before the meeting with the Corps' negotiators reconvened, the pipe price be reconfirmed by making a telephone call to Hydro Conduit. Mr. Alderete declined to do this and, instead, assured Mr. Styron that it would not be necessary; that the pipe price was going to be held firm.

When the meeting again reconvened Mr. Alderete offered to split the difference concerning the Corps' proposed additional reductions and Lt. Col. Pylant refused this approach. Mr. Alderete then made a proposal of $4,700,000 and arrangements immediately commenced to accomplish the paperwork and necessary processing required by the government in order to award a contract, including obtaining from Alderete an up-to-date revised proposal submission with pricing data to meet the requirements of the Truth in Negotiations Act, 10 U.S.C. § 2306(f).

While arrangements to process a contract award were underway, Corps personnel requested that Mr. Alderete check the concrete pipe price with Hydro Conduit and when Mr. Alderete did not comply, placed a telephone call to Mr. Snow at the nearby Hydro Conduit office. Shortly thereafter, at 3:50 p.m., Mr. Snow arrived at the meeting site indicating that he had a revised price for the concrete pipe if certain conditions could be met. Mr. Alderete became very upset at Mr. Snow's appearance, indicating his view that an agreement had been reached and any cost increase now should be to Alderete's detriment and any cost decrease to its benefit. The Corps personnel explained that this was a negotiated procurement requiring disclosure of costs and prices such that the actual current concrete pipe cost to Alderete had to be ascertained and utilized in the contract price. Mr. Styron noted that Hydro Conduit was a supplier to Alderete and suggested that Mr. Snow consult with the Alderete negotiators in private concerning his revised price. The meeting again recessed for this purpose and the Corps personnel left the room.

Mr. Alderete and Mr. Snow then had a heated discussion, with Mr. Alderete accusing Mr. Snow of being in collusion with the Corps of Engineers. Mr. Alderete indicated he had already reduced his price by speculating on a concrete pipe price reduction and Mr. Snow disputed this possibility as such a reduction could only come from his office and he had not made any previous contract with Alderete in this regard. Mr. Alderete suggested that Mr. Snow simply

leave and present a price revision at a later date. Mr. Alderete also suggested that any reduction be provided in the form of a percentage for prompt payment rather than a price reduction. Mr. Snow declined any such percentage arrangement and noted that, as this was a negotiated procurement, he could not delay submitting the revision because of Truth in Negotiations Act requirements. Mr. Snow then stated the conditions for a price revision to be a prompt award of a contract with Alderete, payment upon manufacture (less freight) and no more than 12 joints a day required. Mr. Alderete agreed that the conditions could be met and Mr. Snow then said he had a $160,000 price reduction for Alderete. Mr. Styron questioned Mr. Alderete concerning his statement that he had already reduced the proposed contract price by speculating on a pipe cost reduction. Mr. Styron informed Mr. Alderete that, given the circumstances and the documentation that had been provided to him and used in the presentations to the Corps, he had no way of supporting Mr. Alderete in such a contention. This was because, Mr. Styron stated, it was obvious from the documentation that the pipe price had not been substantially reduced and Mr. Alderete had not mentioned to Mr. Styron that there was even the probability of a pipe reduction or that he had speculated and used it in his earlier revisions. Mr. Alderete continued to insist he had utilized a pipe cost reduction of some $150,000 in reaching the $4,700,000 price, although another Alderete negotiator then indicated that only about $100,000 had been so utilized.

At approximately 4:50 p.m., the negotiating session reconvened with the Corps personnel returning to the room and Mr. Alderete was asked if he had received a price revision from Mr. Snow. Mr. Alderete responded that he had not, which produced considerable confusion until Mr. Alderete added that he had nothing in writing. Mr. Alderete also stated his contention that he had already considered a reduction in pipe cost by having speculated on the amount that might be forthcoming. Mr. Snow was called back into the room and, after stating

the conditions previously presented to Mr. Alderete, handed a written revised quotation to Mr. Alderete reducing the price some $160,000. The Corps personnel then calculated how this would affect the $4,700,000 position then on the table and offered Alderete a price of $4,519,997 and Mr. Alderete refused this price. Lt. Col. Pylant then stated he could agree to allow the overhead and general and administrative cost markups on the $160,000 to remain in the price and made a final offer of $4,539,283. Mr. Alderete said that he would accept only $4,700,000 and at this time Lt. Col. Pylant announced that there was no point in further negotiations and he would so notify SBA. Alderete then inquired of Mr. Styron concerning its appeal rights in this regard and Mr. Styron explained the applicable process.

By a letter dated December 20, 1982 Lt. Col. Pylant notified the SBA of his decision to withdraw the Outlet Conduit project from the 8(a) program as follows (in part):

Reference is made to the above project and the proposed 8(a) Subcontractor, F. Alderete General Contractor, Inc., El Paso, Texas. Further negotiations for this project are no longer possible. In accordance with DAR 1–705.5, it is my intent to advertise the project and make a competitive award.

\*        \*        \*        \*        \*        \*

In accordance with DAR 1–705.5 and the Memorandum of Understanding between the Small Business Administration and the U.S. Army Corps of Engineers, dated 2 February 1979, face-to-face negotiations between the proposed Subcontractor and the Corps of Engineers took place from 22 November 1982 through 24 November 1982, 9 December 1982 through 10 December 1982 and again on 16 December 1982. Additional negotiations took place via a one-hour conference call on 30 November 1982 and via conference calls on 14 December 1982.

\*        \*        \*        \*        \*        \*

The inclosed Record of Negotiations speaks for the level of effort expended by

the Corps of Engineers in attempting to reach a price agreement. Although a price agreement was never reached, a matter of serious magnitude relating to Mr. Alderete and the Truth in Negotiations Act occurred 16 December 1982 which precludes any possibility of contract award. In view of the foregoing, I have no choice but to withdraw this project.

Upon his return to Dallas following the conclusion of negotiations Mr. Styron briefed his supervisor on the matter. Mr. Styron noted that Alderete wished to appeal the Corps' decision under the provisions of 15 U.S.C. § 637(a)(1)(A) ("whenever the Administration and such procurement officer fail to agree, the matter shall be submitted for determination to the Secretary or head of the appropriate department or agency by the Administrator; * * * "). Mr. Styron informed his supervisor that he considered that Alderete had handled the matter in a way that made it appear Mr. Styron was a party to a deception. The negotiation documents submitted by Alderete to the Corps were examined and Mr. Styron's supervisor concurred in Mr. Styron's analysis. In a telephone conversation with Mr. Alderete on December 20, 1982 Mr. Styron discussed the circumstances at length and informed Mr. Alderete that he did not feel at all comfortable filing an appeal from the Corps' decision. At this point Mr. Alderete indicated his opinion that even at $4,700,000 he would have a difficult time under the contract. On December 27, 1982 the Alderete negotiators traveled to Dallas and conferred with Mr. Styron and his supervisor for the better part of the day concerning the possibility of an appeal by SBA. However, based upon the circumstances involved, SBA determined that there was no disagreement with the Corps' decision on which an appeal could be premised.

Accordingly, the Outlet Conduit project was again advertised for bids by the Corps under basically the same specifications with the exception that the performance time was reduced from 500 days to 365 days. Bid opening was scheduled for February 15, 1983. The instant litigation contesting the Corps' decision to proceed with unrestricted bidding was initially commenced in the United States District Court for the Western District of Texas on January 21, 1983. The District Court's order filed March 9, 1983 transferred the matter to this court and also permitted the Corps to award the contract. Alderete had obtained the bid package for this advertised procurement and had obtained some price quotations from subcontractors and suppliers, but determined not to submit a bid. Some 15 bids were received by the Corps of Engineers. All bids received were under $4,700,000 and 10 bids were under the final price offered Alderete by Lt. Col. Pylant of $4,539,283. On March 15, 1983 the contract was awarded and a notice to proceed issued to Burn Construction Co. The contract price was approximately $3,400,000, which sum encompassed an increased cost for the concrete pipe supplied by Hydro Conduit over that contemplated for the previous Alderete proposal.

Subsequent to the award to Burn Construction Co., substantial progress has been made on the project but not at a rate approaching 10 joints per day. Rather, progress has been under five joints per day although testimony at trial indicated that, to some extent, this was due to the contractor's plan of operation and the contractor contemplated meeting the contract's completion date in March of 1984. As of January 1, 1984 some 3,230 lineal feet of pipe remained to be placed on the contract. An order enjoining performance of the contract at this point would require extensive additional planning by the Corps of Engineers and resulting delay in obtaining completion of this flood control project. This is because a termination settlement would have to be reached with Burn Construction Co. and the existing uncompleted work would have to be protected pending the drafting of specifications and the negotiation of a completion contract would, in all likelihood, have to contemplate that the concrete pipe already purchased would be acquired from Burn Construction Co. in a termination set-

tlement and then made available as government-furnished property.

## DISCUSSION

To prevail in this matter plaintiff must establish that the relevant actions of the procurement officials involved lacked a rational or reasonable basis. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C. Cir.1971); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983).

■ Plaintiff argues that the government did not negotiate in good faith in that excessive pipe-laying rates were utilized by the Corps. However, the record does not support a conclusion that the Corps' action with respect to this aspect of the negotiations lacked a reasonable or rational basis. The rates cited to Alderete had support in the standard estimating books utilized by the Corps' negotiators. The purpose in negotiating the length of the construction period required was to reach a fair and reasonable price. Given plaintiff's eventual willingness to perform the work at $4,700,-000, a sum somewhat reduced from its original proposal, and the fact that a number of other contractors bid for the work on a 365-day basis at prices considerably below $4,500,000, it cannot be concluded that the Corps' attempts to obtain a reduction in plaintiff's original $5,267,557 price were not rational.

In regard to the negotiations concerning the construction period for the work required, note must be made of the adverse impact the unauthorized and surreptitious disclosure of the government estimate to Alderete had on reaching an agreement. Because Alderete possessed their internal estimate, without the Corps' knowledge, discussion by the Corps' negotiators of rates not utilized in this estimate obviously irritated Mr. Alderete. This situation contributed to continued demands by Alderete that the estimate which it already possessed be produced, rather than in reasoned discussion addressed to the merits of the cost implications of the rates involved. Had Alderete promptly admitted that it had the estimate rather than continuing to demand

its production during the negotiations, the pipe-laying rate matter might well have been subject to an early resolution on its merits.

■ In any event it is not the function of the court to second-guess the negotiating positions taken by the parties. The pre-award contract claims jurisdiction afforded to the Claims Court under 28 U.S.C. § 1491(a)(3) is to be exercised only in truly extraordinary circumstances. H.R.Rep. No. 312, 97th Cong., 1st Sess. 44, U.S.Code Cong. & Admin.News 1982, p. 11 (1981); *CACI, Inc.—Federal v. United States,* 719 F.2d 1567 (Fed.Cir.1983). The pipe-laying rate aspect of the negotiations for this procurement does not rise to the level of an extraordinary circumstance calling for equitable relief. Rather, the record shows detailed consideration of plaintiff's proposal by the procurement officials and a rational attempt by the Corps' negotiators to reduce the price to a fair and reasonable level.

Plaintiff has not established arbitrary or capricious conduct on the part of the procurement officials with respect to the pipe-laying rate aspect of the negotiation process.

Plaintiff next argues that several aspects of the pipe price controversy establish bad faith by the government. The reduction in the pipe price engendered the controversy on which the section 8(a) contract negotiations finally floundered. The record does not support plaintiff's argument as to bad faith. Rather, it is concluded that the actions taken by the Corps' negotiators had a reasonable or rational basis.

From the evidence of record it is concluded that the contract price quoted by Alderete to the Corps during the conference telephone call on December 14, 1982 did not encompass any reduction premised upon Alderete receiving a lower price for pipe to be supplied by Hydro Conduit. This follows from the fact that the sums quoted by Alderete on December 14 had been computed on November 30, 1982, prior to the date any document or testimony indicates that plaintiff had knowledge of any possible re-

duction by Hydro Conduit in the pipe price. Similarly, the revised price initially presented by Alderete to the Corps on December 16, 1982 could not have included any reduced amount attributable to a possible reduction in the cost of the pipe to be supplied by Hydro Conduit as, again, the document presented was essentially the November 30, 1982 computation by Alderete plus an additional reduction, given orally, of only some $28,000. While it is conceivable that Mr. Alderete could have eventually agreed to perform the contract at $4,700,000 instead of his initial December 16th offer of $4,825,000 based upon some assumption that he could subsequently obtain a $160,000 reduction in the pipe price to make up the $125,000 reduction, any such assumption could not be valid. The applicable provisions of the Truth in Negotiations Act, 10 U.S.C. 2306(f), required that the current cost for the pipe be utilized and, by December 16, 1982, Alderete was aware that a reduction in the pipe cost was possible.

■ Accordingly, when the $160,000 reduction in pipe cost was presented on December 16, 1982 after agreement was reached on a $4,700,000 price which could not have encompassed a reduced pipe price of $160,000, the Corps' approach that a corresponding reduction in the agreed contract price to $4,539,283 was then required has a rational or reasonable basis.

Plaintiff argues, however, that under DAR 3–807.10(b)[2] the Corps had a duty to inform plaintiff as to a reduced pipe price on November 17–18, 1982 when the Corps' negotiators learned of this possibility from Mr. Snow of Hydro Conduit. The better practice would have been for both parties to put all current factual data, such as cost quotes, on the table during negotiations so that, consistent with the policy behind the Truth in Negotiations Act, the price reached would be premised upon accurate, complete and current information. However, any failure by the government to comply with the regulations would not relieve plaintiff of its obligation to use only the current pipe price which, at least after December 15, 1982, Alderete knew was subject to a possible reduction. *M–R–S Manufacturing Co. v. United States,* 492 F.2d 835, 203 Ct.Cl. 551 (1974). As noted previously, plaintiff's submissions on December 16, 1982 did not disclose a revised pipe price and any excuse that the information was not so set forth because it was only tentative or confidential would be equally applicable to the lack of any disclosure by the contracting officer after November 17–18, 1982.

In short, if there exists any delinquency concerning a failure to disclose a possible pipe price reduction prior to 3:50 p.m. on December 16, 1982, the delinquency must be shared by both parties. However, the conditional nature of Hydro Conduit's possible revision prior to that time and the request by Hydro Conduit that information be kept confidential do serve to insulate the action taken from a conclusion that there was no rational or reasonable basis to postpone actual notification until December 16, 1982.[3] Moreover, as discussed previously with respect to the pipe-laying rate, the controversy over the timing of a notification as to a supplier price reduction simply does not rise to the level of an extraordinary circumstance calling for equitable relief.

---

**2.** DAR 3–807.10(b) provides:

"(b) If at any time prior to agreement on price, the contracting officer learns through audit or otherwise that any cost or pricing data submitted are inaccurate, incomplete, or non-current, he shall immediately call it to the attention of the contractor whether the defective data tends to increase or decrease the contract price. Thereafter, the contracting officer shall negotiate on the basis of any new data submitted, or on a basis which makes satisfactory allowance for the incorrect data, and shall reflect these facts in his record of negotiation."

**3.** It is also noted that, on December 10, 1982, the Corps did request that Alderete recheck its price quotations from suppliers and on December 14, 1982 Alderete had reported to the Corps, during a telephone conference, that the pipe supplier had been contacted and was working on a price revision. Thus, this is not a situation where the government had information as to a possible reduced cost and did nothing. Alderete was requested to check with the supplier well prior to December 16, 1982 and to present a revised proposal on the 16th.

Plaintiff then contests the action of the Corps in terminating negotiations following plaintiff's rejection of the offer of $4,539,283 on December 16, 1982. Plaintiff indicates that it should have been permitted time after December 16 to recheck all of its supplier quotations and that the Corps should have taken additional time to investigate whether the $4,700,000 price already encompassed the $160,000 price reduction delivered by Mr. Snow of Hydro Conduit the afternoon of December 16, 1982 as plaintiff then asserted. As discussed previously it is not the court's function to second-guess the negotiating actions taken by the parties. Given the unusual reaction by Alderete to Mr. Snow's appearance at the conference with a $160,000 price reduction and the rejection of the Corps' ensuing offer, it is sufficient to conclude that the Corps had a reasonable or rational basis to terminate the negotiations absent agreement to a $4,539,283 price. The purpose of the previous recess in the negotiations on December 10, 1982 had been to obtain a revised offer from Alderete after price quotes from suppliers were all rechecked. In this circumstance, not providing additional time could not be considered an arbitrary or capricious act calling for equitable relief by the Claims Court.

Finally, plaintiff argues that it did not receive adequate SBA assistance. With the exception of the unauthorized action of the El Paso SBA office in releasing the Corps' internal estimate to Mr. Alderete (a misguided attempt to provide assistance), the record shows substantial assistance provided Alderete by SBA in the negotiations. The assigned negotiator, Mr. Styron, contributed suggestions which were most helpful in the negotiations leading up to the initial agreement for a $4,700,000 price. The action of the SBA in not appealing the termination of the section 8(a) negotiations had a rational or reasonable basis in that the action was taken only after a careful analysis of the negotiating documents as compared to Alderete's representations concerning the concrete pipe price and after hearing Alderete's views on the matter in an extensive conference.

## CONCLUSION

Based upon the above considerations it is concluded that, after a substantial trial on the merits, plaintiff has not established the requisite arbitrary or capricious action on the part of the procurement officials involved in the Keystone Outlet Conduit project to obtain Claims Court relief. The cited actions of these procurement officials in the section 8(a) negotiations have been shown to have a sufficient reasoned or rational basis such that no ground for equitable relief under 28 U.S.C. § 1491(a)(3) has been established. This conclusion also necessarily removes any basis for the recovery of Alderete's proposal preparation expenses in this matter. *Keco Industries, Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970).

Accordingly, a final judgment shall be entered in this matter dismissing plaintiff's complaint.