**M–R–S MANUFACTURING COMPANY**

v.

**The UNITED STATES.**

No. 95–72.

United States Court of Claims.

Feb. 20, 1974.

Albert H. Greene, Washington, D. C., atty. of record for plaintiff. Richard J. Ney, Washington, D. C., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and SKELTON and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This contract action involves an appeal by the plaintiff, M–R–S Manufacturing Company, from a decision of the Armed Services Board of Contract Appeals (hereinafter referred to as the Board) in M–R–S Manufacturing Company, ASBCA No. 14825, 71–1 BCA, ¶ 8821, at 40,998 (decided March 31,

1971). The Board found that the plaintiff's submission of defective cost or pricing data to the Government resulted in overstatements in the prices of two contracts between the parties. The data found to be defective involved labor costs for four manufactured parts and a duplication in a bill of materials. On cross motions for summary judgment, the parties ask this court to review the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970). Such a review presents the issues of whether or not the Board's decision is supported by substantial evidence and is correct as a matter of law. Resolving these issues requires further interpretation of the Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970) [1] and the now standard Price Reduction for Defective Cost of Pricing Data clause [2] (Defective Pricing Clause), added to Government contracts pursuant to that statute.

### Factual Background

On January 23, 1967, the Government issued to the plaintiff sole source request for proposal (RFP) No. DSA–700–67–R–5960 calling for certain heavy duty earth moving equipment. The return date of the RFP was February 2, 1967. Since the RFP allowed only a short period of time for response, the plaintiff's proposal utilized cost figures which had been used in a previous procurement for identical equipment. The proposal included the applicable DD Forms 633 (Contract Pricing Proposals) which listed the proposed prices for the equipment. The first two columns of the forms showed a breakdown of the prices into individual cost elements. The third column, which allowed a reference to the source data used to form the proposal in the first two columns, contained no entries. The proposal included no supporting documentation.

On February 13, 1967, the Government requested the Defense Contract Audit Agency (DCAA) to perform an audit to provide the information necessary for the development of a realistic negotiation objective. A DCAA auditor conducted an audit, or price proposal evaluation, between February 20, 1967, and March 1, 1967, at the plaintiff's plant, and then submitted an audit report. The report contained nothing concerning the allegedly defective data involved in this action. After negotiations between the parties and plaintiff's

---

1. The Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970), reads in pertinent part as follows:

"(f) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—

"(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;

\* \* \* \* \*

"Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date

of agreement on the negotiated price as is practicable), was inaccurate, incomplete or noncurrent: \* \* \*."

2. The Price Reduction for Defective Cost or Pricing Data clause reads in pertinent part as follows:

"Price Reduction for Defective Cost or Pricing Data (Sept. 1964).

"(a) If the Contracting Officer determines that any price, including profit or fee, negotiated in connection with this contract was increased by any significant sums because the Contractor, or any subcontractor in connection with a subcontract covered by (c) below furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Contractor's Certificate of Current Cost or Pricing Data, then such price shall be reduced accordingly and the contract shall be modified in writing to reflect such adjustment.

"(b) Failure to agree on a reduction shall be a dispute concerning a question of fact within the meaning of the disputes clause of this contract."

execution of a Certificate of Current Cost or Pricing Data,[3] the Government awarded Contract DSA 700–67–C–C976 (Contract C976) on March 30, 1967.

On July 13, 1967, the Government issued sole source RFP No. DSA 700–68–R–0145 to M–R–S calling for more heavy duty equipment. This equipment was identical to the machinery involved in Contract C976. The plaintiff responded with a proposal which included the applicable DD Forms 633. The first two columns of the forms contained appropriate price information, but the third column contained nothing. A letter which accompanied the proposal read, in part, as follows:

Reference: Solicitation No. DSA–700–68–R–0145

We consider this proposal and Contract DSA–700–67–C–C–976 inter-related, as in effect, this Proposal is essentially the option we expected to be exercised when we secured Contract No. DSA–700–67–C–C–976.

Therefore, if your auditor's figures on Contract DSA–700–67–C–C–976 are acceptable for this new procurement of identical items, you will find the attached DD Form 633 utilizes the EXACT Purchased and Sub-Contract Parts costs, the EXACT Direct Material cost and the EXACT Direct Labor cost as AUDITED and NEGOTIATED on Contract No. DSA–700–67–C–C–976.

The proposal was later followed by additional DD Forms 633. No support data accompanied the forms, but a third set forwarded on August 16, 1967, listed in the third column a reference to "cost records" in explanation of the prices quoted in the first two columns.

The Government officials decided not to request audit assistance with respect to the plaintiff's proposal because direct costs had been verified by the audit in connection with Contract C976, and indirect costs had been examined in another audit performed in connection with a May 22, 1967, proposal by M–R–S for production of similar, but larger, equipment. During final negotiations on August 16, 1967, the direct costs accepted by the Government were the same figures submitted in support of the proposal which resulted in Contract C976. Negotiated indirect costs were based on the audit performed in connection with the May 22, 1967, proposal for larger equipment. The plaintiff neither offered nor submitted any other cost data, and the Government requested no such data. The plaintiff executed a Certificate of Current Cost or Pricing Data on August 17, 1967, and received an award of Contract DSA 700–68–C–8006 (Contract 8006) on August 25, 1967.

Understanding the issues in this case requires a rather detailed explanation of the plaintiff's accounting system and the nature of the February audit by the Government. The plaintiff maintained a Kardex-file accounting system for manufactured parts. After fabricating a part, the plaintiff recorded manufacturing costs for the production run on a production card with a production order number as its means of identification. The production card contained the name of the part, the part number, the date the production run commenced, the completion date, the number of units manufactured, and a breakdown of costs. The cost breakdown included entries for the unit and total costs of materials, labor, and burden for the particular run. After each production run was completed, the sum of the costs for materials, labor, and burden was posted on a unit and total basis to an inventory card. The inventory card contained the part name, the part number, and a list of every production run on that part. For each production run, the card listed the

3. The Certificate of Current Cost or Pricing Data read as follows:

"This is to certify that, to the best of my knowledge and belief, cost or pricing data submitted to the Contracting Officer or his representative in support of RFP No. DSA–700–67–R–5960 are accurate, complete and current as of the date of execution of this certificate."

production order number, the date of completion, and the costs on a total and unit basis.

As can be seen, plaintiff's Kardex file contained two relevant types of cards for manufactured parts. Although the inventory cards showed cost variations among production runs, they did not show precise labor and material costs for manufactured parts on particular production runs. These precise costs could be obtained by consulting the individual production card pertaining to a particular production run. This was done by determining the production order number from the inventory card and then going to the individual production card bearing that production order number.

When the auditor who conducted the first price evaluation in February 1967, went to the plaintiff's plant, he carried the plaintiff's proposal and DD Forms 633. After submitting the proposal, plaintiff had prepared additional cost data consisting of a priced bill of materials. This bill of materials, which listed manufactured parts by part name and number, was given to the auditor. The bill contained a breakdown of costs into categories for raw materials, purchased parts, direct labor and burden, and referenced the particular production run from which the stated costs were derived. The plaintiff also gave the auditor copies of the production cards for each production run referenced in the bill.

The auditor commenced his price evaluation in a room which contained the Kardex file of the inventory cards. The auditor was familiar with the plaintiff's facility and accounting system, and, as he testified before the Board, he could backtrack to any accounting source from the information furnished to him. Before the Board, there was a substantial question concerning whether or not the auditor requested, or was given, production cards other than those cited in the bill of materials. The Board found that the auditor did not sample or test pro-duction costs for the parts in issue beyond the costs listed in the bill of materials. The plaintiff does not contest that finding before this court. Following his price evaluation, the auditor submitted a report as stated above.

In November 1967, another auditor performed an additional price evaluation of the plaintiff's May 22, 1967, proposal for the larger equipment. The cost data which the plaintiff gave to the auditor were the same data that had been given to the previous auditor and which had been used in the negotiation of Contract C976. During the course of the second price evaluation, the auditor discovered two types of allegedly defective data. The first which plaintiff concedes, was a duplication of parts in the priced bill of materials. The second was allegedly defective data concerning the cost of direct labor attributable to four manufactured parts. The auditor discovered production cards evidencing lower direct labor costs than the direct labor costs incurred in the production run cited in the plaintiff's bill of materials. For the four parts, the production run referenced in the bill had the highest direct labor cost of all runs and none of the referenced runs were the most current runs experienced by the plaintiff.

Based on the report of the second auditor, the contracting officer decided that the two types of allegedly defective data showed a failure to disclose accurate, complete, and current cost data as required by the Truth in Negotiations Act. The duplication and the defective labor cost data were found to have resulted in a total cost overstatement of $176,845 on Contracts C976 and 8006. For overstatement due to the duplication, $23,028 was allocated to Contract C976, and $27,907.50 was allocated to Contract 8006. The overstatement from defective labor cost data was allocated $57,300 to Contract C976 and $68,610 to Contract 8006. On appeal to the Board, the parties stipulated that the plaintiff understated its costs on the two contracts by a total of $32,215. The Board upheld the contracting officer's decision

and offset the overstatement by the amount of the stipulated understatement. The net overstatement was found to be $144,630.50.

Before this court, the plaintiff contends that with respect to Contract 8006, it should be liable for neither overstatement from duplication, nor overstatement due to defective labor cost data. With respect to Contract C976, the plaintiff argues that it should not be liable for overstatement due to alleged defectiveness in labor cost data, and that liability for overstatement due to duplication should be offset by its cost understatements on that contract. Plaintiff's contentions are fully explained below.

### Contract 8006

■ The plaintiff bases its primary argument concerning Contract 8006 on the assertion that no data were submitted "in support" of its proposal for that contract. The plaintiff contends that the Government's right to a price adjustment because of defective cost and pricing data is a contract right, and, therefore, limited to the terms of the contract. The Defective Pricing Clause, the argument continues, allows price reductions only when data referenced in the Certificate of Current Cost or Pricing Data are not accurate, complete, and current. The only data so referenced are data submitted "in support" of the proposal. Since no data were submitted "in support" of the proposal for Contract 8006, no data were certified as accurate, complete, and current, and therefore, the Defective Pricing Clause does not allow a price adjustment. This argument applies to the bill of materials duplication and the allegedly defective labor cost data.

The plaintiff's argument contains several flaws, any one of which would be fatal, even if it stood alone. First, the Board found that the DD Forms 633 submitted with plaintiff's proposal constituted cost and pricing data. The Board also found that the reference to "cost records" in the third set of DD

Forms 633 meant the records from which the data furnished to the first auditor were compiled. The plaintiff does not argue that any of the Board's findings are not supported by substantial evidence, but merely asserts that as a matter of law no data were submitted "in support" of the proposal for Contract 8006. As a matter of law, we can find nothing wrong with the findings by the Board. The nature of the DD Forms 633, with columns for total cost, unit cost, and source data, refutes any contention that such forms are not cost and pricing data.

Even if the Board's finding concerning the reference to "cost records" is attacked as not supported by substantial evidence, the finding can still stand. Certainly the letter which accompanied the plaintiff's proposal for Contract 8006, and stated that the attached DD Form 633 utilized the exact costs audited and negotiated for Contract C976, constitutes substantial evidence in support of the finding. This is especially true since the plaintiff offers no other explanation of the reference to "cost records." The cost data submitted in support of the proposal for Contract 8006 were the same data submitted in support of the proposal for Contract C976. Therefore, the Government is entitled to a price adjustment on Contract 8006 for the overstatement caused by the duplication in the bill of materials. The propriety of an adjustment on Contract 8006 for the cost of direct labor on the four manufactured parts turns on whether or not the data submitted in support of Contract C976 were defective.

The second flaw in the plaintiff's argument concerns its assertion that data must be submitted in support of a proposal before the Defective Pricing Clause allows a price reduction. The plaintiff interprets the Defective Pricing Clause and the Certificate of Current Cost or Pricing Data so as to sanction his argument. Such an interpretation might have merit if only contractual provisions, and not a statutory directive, were involved. However, since

the clause and certificate exist pursuant to the directions of the Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970), the scope of these items turns on the scope of the Act.

■■ As this court has said on several occasions, the Truth in Negotiations Act imposes a duty on Government contractors to completely disclose cost and pricing information. Sylvania Elec. Prods., Inc. v. United States, 479 F.2d 1342, 202 Ct.Cl. 16 (1973); Lockheed Aircraft Corp. v. United States, 432 F. 2d 801, 193 Ct.Cl. 86 (1970); Cutler-Hammer, Inc. v. United States, 416 F.2d 1306, 189 Ct.Cl. 76 (1969). The information so disclosed must be, in the words of the Act, accurate, complete, and current. The Act grants to the Government the right to adjust the contract price when the price is increased because the contractor did not meet his duty to furnish accurate, complete, and current data. Therefore, even if, as the plaintiff asserts, no data were submitted "in support" of the proposal for Contract 8006, the plaintiff still did not meet the requirements imposed by the Act. But regardless of what the situation would have been if the plaintiff had submitted no data, we must still deal with the plaintiff's assertions concerning the Contract C976 data since we approve the Board's finding that the same data were submitted for Contract 8006.

The plaintiff makes one other argument concerning Contract 8006. It asserts that even if it was obligated to furnish accurate, complete, and current data, the Government waived the obligation. Waiver is said to be shown by the fact that the Government used only data available on March 23, 1967, as a basis for price reduction, even though the certificate for Contract 8006 was not executed until August 17, 1967. Since the Government chose to ignore any data developed between March 23 and August 17, the plaintiff says the obligation to furnish accurate, complete, and current data was waived. The most basic flaw in this argument is the assumption that the obligation to furnish proper data can be waived by a Government agent. The duty to furnish accurate, complete, and current data is a duty imposed on Government contractors by a statute, and, therefore, that duty cannot be waived by a Government agent. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L. Ed. 40 (1940); Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); see Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Montilla v. United States, 457 F.2d 978, 198 Ct. Cl. 48 (1972).

### Contract C976

With respect to Contract C976, the plaintiff argues that the particular facts of this case demonstrate as a matter of law that it met its duty to submit accurate, complete, and current cost or pricing data concerning the four manufactured parts in issue. This argument is relevant to both contracts involved in this case since we hold that the data submitted in support of Contract C976 were also submitted in support of Contract 8006. The facts upon which the plaintiff relies are that the DCAA auditor who performed the February 1967, price evaluation received a bill of materials including all parts and part numbers, knew previous production runs had been completed, and knew how to obtain all the information in the Kardex file. These facts, the argument goes, show that the plaintiff submitted all the information in the Kardex file to the auditor. Since the file included all the data available to the plaintiff, the obligation to submit accurate, complete, and current data was fulfilled.

The data in the Kardex file was certainly accurate, complete, and current since it comprised all existing information concerning the four parts. On the other hand, the data physically delivered to the auditor, i. e., the bill of materials, the inventory cards and the production cards for only one run per part, were not accurate, complete, and current. Production cards not physically delivered reflected the costs of other produc-

tion runs, all of which were lower, and some of which were more current, than the costs shown in the delivered cost or pricing data. So, the issue becomes whether or not the plaintiff *submitted* all of the Kardex file data to the Government, or stated another way, what must a Government contractor do to *submit* data to the Government within the meaning of the Truth in Negotiations Act.

In Lockheed Aircraft Corp. v. United States, *supra,* this court held that making a Kardex file available to a Government auditor did not fulfill the duty to submit accurate, complete, and current information to the Government. The plaintiff contends that the case at bar is decisively different because an accurate audit through the Kardex file involved in *Lockheed* was not possible. The contractor involved in *Lockheed* submitted no bill of materials, and, therefore, the auditor could not determine which parts were purchased for the equipment in issue. Since the auditor could not determine what information in the file was relevant to the contract, the file certainly had not been *submitted* to the Government.

Unlike the situation in *Lockheed,* the plaintiff in this case did submit a bill of materials to the auditor and an accurate audit of the plaintiff's Kardex file was possible. There is dicta in the *Lockheed* opinion which indicates that making a Kardex file available and submitting a bill of materials satisfies the requirement to furnish accurate, complete, and current data. That language went further than was necessary to decide the case, and although we give such dicta considerable weight, we conclude that it does not control the decision in the instant case. The facts hypothesized in *Lockheed* by such dicta are now actually before us in our case and we must decide the case on the basis of those facts.

■ A proper determination of what acts are sufficient to satisfy a Government contractor's duty to submit information requires an examination of the

reason Congress required such submission. This court has stated that the purpose of the Truth in Negotiations Act was to avoid excessive contract costs that result from a contractor having in his possession accurate, complete, and current information when the Government does not possess the same data. Sylvania Elec. Prods., Inc. v. United States, *supra;* Lockheed Aircraft Corp. v. United States, *supra;* Cutler-Hammer, Inc. v. United States, *supra.* In *Lockheed,* we stated that the only way to further the purpose of the statute was to require a complete disclosure of costs known to the contractor. The statutory requirement was further explained in *Sylvania* as follows:

> \* \* \* In order that there be effective disclosure of cost and pricing data by the prospective contractor the Government must be clearly advised of the relevant cost and pricing data. \* \* \*

> If the Truth in Negotiations Act is to have any force and effect then the Government must be clearly and fully informed. This can only be achieved by complete disclosure \* \* \*. [479 F.2d at 1348, 202 Ct.Cl. at 26.]

We fully recognize that words such as "clearly advised" and "complete disclosure" do not automatically resolve difficult questions. We do believe, however, that such language adequately shows the intent and purpose of the Truth in Negotiations Act and how it should be interpreted. A proper consideration of the Act's purpose, as stated above, is of great help in applying its provisions to cases such as the one before us.

■ Situations wherein accurate, complete, and current information is known to the contractor and not known to the Government can certainly be avoided if such information is physically delivered to the Government and the information's significance to the negotiation process is made known to the Government by the contractor. We do not hold that both of these conditions must always be met before a contractor can be

said to have submitted the required information to the Government. We conclude, however, that if a contractor possesses accurate, complete, and current information that is relevant to negotiations with the Government, and he neither physically delivers the data to the Government, nor makes the Government aware of the information's significance to the negotiation process, then he has not fulfilled his duty under the Act to furnish such information to the Government.

 The plaintiff in the instant case did not physically deliver to the Government many of the production cards which showed production runs that were more current and less expensive, at least for direct labor, than the runs for which production cards were delivered. The plaintiff also failed to make any Government agent aware that the Kardex file contained production cards evidencing runs that were more current and less expensive than those runs on which the Government was given information. For these reasons, and because this information was very relevant to the negotiations, the plaintiff did not fulfill its duty to submit required information to the Government. The fact that the Government chose to utilize an auditor who knew other production runs had been completed and knew how to use the Kardex file did not alter the nature of the plaintiff's duty, except to add another Government agent to whom information could have been submitted. If the presence of an auditor lessened the extent of a contractor's duty to submit correct and current information, then a danger would exist that a contractor could submit excessively high proposals, make voluminous incorrect data available to the auditor and then hope the auditor would be unable to extract the significant and correct information. The possibility of such a practice should be eliminated as it would be contrary to the purpose of the Truth in Negotiations Act.

*Conclusion*

The plaintiff does not attack the decision of the Board on grounds other than those mentioned above. No attack is made on the reasonableness nor the manner in which overstatements were calculated. As indicated above, we hold that the plaintiff cannot prevail on any of its contentions and that the Board's decision withstands the standards of a Wunderlich Act review and is affirmed. Accordingly, the defendant's motion for summary judgment affirming the Board's decision is allowed and judgment is entered in favor of defendant on its counterclaim against plaintiff for the sum of $144,630.50, plus interest at the rate of six percent per annum from October 22, 1969, less all payments heretofore made by plaintiff on said amount and interest thereon. The plaintiff's motion for summary judgment is denied, and the petition is dismissed.