UNITED STATES of America ex rel. Roger L. SANDERS, et al., Relators,

v.

ALLISON ENGINE COMPANY, et al., Defendants.

No. C–1–95–970.

United States District Court, S.D. Ohio, Western Division.

Nov. 17, 2003.

James Burdette Helmer, Jr., Paul Bryan Martins, Robert M. Rice, Helmer, Martins & Morgan, Cincinnati, OH, Don McKenna, Scott A. Powell, Hare, Wynn, Newell & Newton LLP, Birmingham, AL, Gerald F. Kaminiski, Ass't U.S. Attorney, Cincinnati, OH, Joyce R. Branda, Michael F. Hertz, Paul J Wogaman, Washington, DC, for Relators.

Glenn Virgil Whitaker, Victor A. Walton, Jr., Vorys, Sater, Seymour & Pease, Cincinnati, OH, James A. Bensfield, Kara N. Schmidt, Peter B. Hutt, III, Miller & Chevalier, Chartered, Washington, DC, Daniel John Donnellon, Keating Muething & Klekamp, Cincinnati, OH, Douglas Lee Hensley, Matthew K. Buck, William Alan Posey, Keating, Muething & Klekamp, P.L.L., Cincinnati, OH, Jerome Charles Randolph, Washington, DC, Lawrence Robert Elleman, Dinsmore & Shohl, P.L.L., Thomas Jason Murphy, Dinsmore & Shohl, David Paul Kamp, White, Getgey & Meyer Co. LPA, Cincinnati, OH, James J. Gallagher, McKenna & Cuneo, Los Angeles, CA, Susan A. Mitchell, McKenna, Long & Aldridge LLP, Los Angelos, CA, Thomas M. Abbott, McKenna & Cuneo, Los Angeles, CA, for Defendants.

## ENTRY AND ORDER OVERRULING THE REPORT AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE (Doc. # 393) REGARDING RELATORS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. # 167)

ROSE, District Judge.

As required by 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b), the District Judge has made a de novo review of the Record on the matter of the Motion of Relators for Partial Summary Judgment As To Defendant Allison Engine Company for the Submission of False Claims Relating To Recurring Costs for AG9140 Generator Sets (Doc. # 167). In addition to reviewing the Motion for Summary Judgment (Doc. # 167) and associated Memorandum, the District Judge has reviewed Defendant Allison Engine Company's Memorandum In Opposition (Doc. # 187), Relators' Reply Memorandum (Doc. # 228) and the transcript of the hearing held on the Motion for Partial Summary Judgment.

The District Judge has also reviewed the Report and Recommendations of United States Magistrate Judge Timothy S. Hogan (Doc. # 393) to whom this case was

referred pursuant to 28 U.S.C. § 636(b) as well as Motions To Review the Magistrate's Report and Recommendations filed by Defendants Allison Engine (Doc. # 406) and General Motors (Doc. # 411), Relator's Memorandum In Opposition (Doc. # 421), and Reply Memorandums filed by Allison Engine Company (Doc. # 423) and General Motors Corporation (Doc. # 424).

Based on a de novo review of the Briefs and associated documents regarding Relators' Motion for Partial Summary Judgment (Doc. # 167), the Report and Recommendation (Doc. # 393) is overruled for the reasons set forth herein. The standard of review for motions for summary judgment will first be set forth followed by an analysis of Relator's Motion.

## STANDARD OF REVIEW

The standard of review applicable to Motions for Summary Judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not

...obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed.R.Civ.P. 56(c). The analysis now turns to Relators' Motion.

## RELATORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

In this Motion for Partial Summary Judgment, Relators claim that Allison Engine Company ("Allison") violated the False Claims Act ("FCA"). To prove a violation, Relators must show that Allison violated federal law or the terms of its contract and did so knowingly. 31 U.S.C.S. § 3729(b) (Law. Co-op 1996). Relators must show by a preponderance of the evidence that (1) the defendant presented or caused to be presented a claim for payment to the United States: (2) the claim was false or fraudulent; and (3) the defendant knew that the claim was false or fraudulent. *Id.*

In their Motion, Relators argue that Allison is liable under the FCA on two separate grounds: (I) for its false representations as to its recurring costs on the model AG9140 generator set ("gen set") and (II) for its failure to provide complete, accurate and current information regarding those costs. Relators argue that Allison's duty to disclose complete, accurate and current cost information springs from three independent sources: (1) contractual provisions incorporating the certification requirements of the Truth In Negotiations Act ("TINA"), (2) contractual provisions incorporating the price reduction requirements of the TINA, and (3) contractual provisions governing Engineering Change Proposals ("ECPs"), Allison procedures and the course of dealing between the parties. Relators' claim regarding false representations is first addressed followed by Relators' claim that Allison failed to provide complete, accurate and current information regarding Allison's costs on the AG9140 gen sets.

## I. FALSE REPRESENTATIONS ON THE ECP AS TO RECURRING COSTS

Relators claim that Allison falsely procured a higher price for redesigned gen sets under ECP No. 310–01A0C040 (hereinafter "ECP–C040") by falsely representing that its recurring costs of the redesign "remain unchanged from those of the AG9130." (Relators' Exhibits and Deposition Excerpts In Support of Relators' Motions for Summary Judgment (Doc. # 172) Exhibit (hereinafter "Realtors' Ex.") 16, DD Form 1692–3.) Relators argue that Allison made this false representation when it submitted the ECP–040 to produce the model AG9140 gen sets.

An ECP (DD Form 1692) is used to process an engineering change. The instructions for preparation and submission of the ECP are found in DOD–STD–480A (hereinafter "480A"). (Defense Federal Acquisition Regulation (hereinafter "DFAR") 252.243–7000(a).) 480A also identifies the technical, fiscal and logistic information necessary to define the impact of the proposed engineering change.

480A *unambiguously* defines the term "cost" as used in the ECP as: "[t]he term 'cost' means cost to the Government." (480A ¶ 110.14.) Further, 480A defines "non-recurring costs" as "[o]ne-time costs which will be incurred if an engineering

change is ordered and which are independent of the quantity of items changed, such as, cost of redesign, special tooling or qualifications." (480A ¶ 110.14.1.) In addition, 480A defines "[r]ecurring costs" as "[c]osts with are incurred for each item changed or for each service or document ordered." (480A ¶ 110.14.2.) Both "non-recurring" costs and "recurring" costs mean costs to the Government.

On May 5, 1993, Allison submitted ECP–C040 to the Navy and to Bath Iron Works for production of the redesigned AG9130 gen sets called the AG9140. In block 21 of ECP–C040, Allison indicated that the estimated cost/savings impact of the ECP would be "no cost." This same entry is found in block 22 of the ECP which asks for the total estimated costs/savings impact of the basic and all related ECPs. In block 48 of the ECP, Allison indicated that there would be "no cost" regarding recurring production cost/savings, recurring retrofit cost/savings and recurring integrated logistic support cost/savings. In the "total" and "other costs/savings to government" columns of block 48, Allison provided the following statement: "The Recurring costs of the AG9140 remain unchanged from those of the AG9130. The Non–Recurring costs for the AG9140 will be funded via the 501–K34/AG9130 Component Improvement Program." On November 23, 1993, the Navy approved ECP–C040 and granted Bath Iron Works permission to proceed with a contract modification for the production of model AG9140 gen sets agreeing that Allison would be paid the same for the AG9140 gen sets as it had for the original AG9130 gen sets. (Relators' Ex. 37.)

ECP–C040 does not include statements by Allison that specifically refer to any changes in Allison's costs. In view of the fact that Allison's contract was a fixed-price contract (Relators' Ex. 131, Contract C–455–125M) and the fact that "cost" in the ECP means cost to the government, Allison was indicating on the ECP that there would be no change in the fixed price to be paid by the Government. There are no genuine issues of material fact and Allison did not represent on the ECP that Allison's recurring costs would remain unchanged.

In opposition to this finding, Relators identify testimony by the Navy Contract Officer who approved ECP–C040. He testified that he understood that the contractor is to disclose its costs on the ECP. (Relators Ex. Shufelt 5/22/01 Dep. at 102–03.) However, the applicable instructions for completing the form clearly define cost as cost to the government and not cost to the contractor and the contracting officer is not in a position to provide the legal interpretation or legal effect of the instructions regarding completion of the ECP.

Three documents cited by Allison in their Motion for Summary Judgment on this same issue support the finding that cost on the ECP means cost to the government and not cost to the contractor. First, the contractual meaning of "no cost" as "no price change" is consistent with language termed Data Item Description ("DID") E2 which is incorporated in the Option II Contract. (Doc. # 163 Ex. 7.) The Option II Contract between Bath Iron Works and Allison permitted Bath Iron Works to issue purchase orders for gen sets in calendar years 1992–1996.

DID E2 provides that the purpose of an ECP is to provide "sufficient data to allow evaluation of the effect on technical performance, logistics support, interface considerations, and price of the proposed change." (*Id.*) DID E2 also provides that ECPs shall be prepared in accordance with DOD–STD–480A and shall contain "detailed pricing data," broken into "Recurring Costs" and "Non–Recurring Costs."

(*Id.*) The requirement to provide data to allow evaluation of the *price* of the proposed change indicates that the cost to the Government is to be provided since the price is the cost to the Government.

Second, DID E2 also provides that the contractor's ECP is to be prepared in accordance with the "General Provisions of the Purchase Order." (*Id.*) This is a reference to a Bath document entitled "Purchase Order General Provisions." (*Id.* Ex. 8; Ex. 20 ¶ 24.) Paragraph 24 of the General Provisions addressed ECPs and provides that ECPs "shall include .estimates of the impact of the proposed changes on (I) the price of the Contract Products and (ii) delivery of the Contract Products." (*Id.* Ex. 8.) Thus, the contract documents indicate that Allison, in submitting an ECP, is to indicate the price that it proposes to charge for the change, or, in other words, the cost to the Government.

Finally, the Option II Contract includes a standard government contract clause identified as DFARS 252.243–7000 entitled "Engineering Change Proposals." (*Id.* Ex. 9 p. I–58, Ex. 20 ¶ 25.) DFARS 252.243–7000 requires that contractor initiated engineering change proposals must include a "not to exceed" price or a "not less than" price. (*Id.* Ex. 9 at (b).) DFARS 252.243–7000 further indicates that, when the price of the engineering change is $100,000 or more the contractor must submit various additional forms. (*Id.* at (c).) Thus, DFARS 252.243–7000 explicitly contemplates that a contractor will propose a price, or cost to the Government, for the change that the contractor is offering to implement.

There are no genuine issues of material facts regarding the meaning of cost as used on the ECP. Cost on the ECP means cost to the Government. There are also no genuine issues of material fact regarding whether Allison's indication on the ECP was a false claim. It was not. Allison indicated that ECP–C040 was offered at no cost to the Government and the Government accepted this proposition. There being no genuine issues of material fact, Relators are not entitled to summary judgment on their claim against Allison regarding alleged false claims on ECP–C040.

Having determined that Allison did not make a false claim, there is no need to address the "knowing" requirement for liability under the FCA. The analysis now turns to Relator's claim that Allison had a duty to provide complete, accurate and current information regarding the AG9140 costs and failed to provide that cost information.

## II. FAILURE TO PROVIDE COMPLETE, ACCURATE AND CURRENT COST INFORMATION

Relators argue that Allison's duty to disclose complete, accurate and current cost information springs from three independent sources: (1) contractual provisions incorporating the certification requirements of the Truth In Negotiations Act ("TINA"), (2) contractual provisions incorporating the price reduction requirements of the TINA, and (3) contractual provisions governing Engineering Change Proposals ("ECPs"), Allison procedures and the course of dealing between the parties.

This analysis begins with a summary of TINA. The purpose of TINA is "to avoid excessive contract costs that result from a contractor having in his possession accurate, complete and current information when the Government does not possess the same data." *M–R–S Manufacturing Company v. United States,* 203 Ct.Cl. 551, 492 F.2d 835, 842 (1974). TINA is implemented through various federal acquisition regulations called "FARs."

TINA provides that "[i]f a cost is known when the contract price is being negotiated, it must be furnished accurately, completely and on a current-price basis." *Lockheed Aircraft Corporation v. United States*, 193 Ct.Cl. 86, 432 F.2d 801, 804 (1970). Cost or pricing data must be submitted prior to the award of any negotiated prime contract where the price is expected to exceed $100,000, prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $100,000 and prior to the award of a subcontract an any tier where the prime contract and each higher tier subcontractor have been required to furnish such a certificate if the price or price adjustment of such subcontract is expected to exceed $100,000. *Sylvania Electric Products, Inc. v. United States*, 202 Ct.Cl. 16, 479 F.2d 1342, n. 2 (1973). Said another way, TINA applies when initial contracts are being negotiated under certain circumstances and when changes to those contracts are being negotiated.

For TINA applications, "cost or pricing data" means all facts that, as of the date of agreement on the price of a contract ... a prudent buyer or seller would reasonably expect to affect price negotiations significantly. 10 U.S.C.S. § 2306a(h)(1) (Lawyers Co-op 2002). Cost or pricing data does not include information that is judgmental. *Id.*

■ In sum then, there are three principal aspects of TINA that are material to this matter. First, TINA's obligations have a price-based trigger. TINA obligations are triggered only when a price adjustment to the Government is expected to exceed a certain dollar threshold. Second, when cost or pricing data must be disclosed, only *factual* cost or pricing data must be provided. Factual information is not judgmental. It is discrete and quantifiable and can be verified and audited. *Appeal of Litton Systems, Inc. Amecom*

*Division*, 1992 WL 42752, 1992 ASBCA LEXIS 86 (1992). Third, TINA's obligations terminate at the time of final agreement on price. The analysis now turns to the first of three allegations regarding the provision of current, accurate and complete cost information.

1. *Duty To Disclose Arising From Contractual Provisions Incorporating the Certification Requirements of the TINA*

■ Realtors argue that Federal Acquisition Regulation ("FAR") 52.215–24 requires Allison to certify its cost or pricing data when any change involves a price adjustment expected to exceed $500,000 over the life of the contract. The price threshold is calculated on the sum of all subcomponent increases or decreases in price. According to Realtors, Allison's negotiated price reduction with General Tool Company ("GTC") triggers this duty and requires Allison to submit a certification of cost or pricing data to Bath Iron Works or the Navy along with the ECP–C040.

In this case, there was no price adjustment to Allison's contract as a result of ECP–C040 and Allison was therefore not required to provide or certify its cost or pricing data. Had there been a duty to disclose, however, Relators have presented no evidence that Allison had any facts regarding its costs when ECP–C040 was presented and approved. (Doc. # 187 Ex. 3, Agresto Dep. at 208–11.)

TINA requires disclosure of facts that, as of the date of agreement on the price of a contract ... a prudent buyer or seller would reasonably expect to affect price negotiations significantly. Relators identify the following as evidence of cost or pricing data that was available to Allison at the time of entering into the contract to produce the model AG9140 gen set:

A December 2, 1992, memorandum from Allison's Program Manager, Mr. Krohne, to his supervisor, Vice President Jim Lunsford, in which Mr. Krohne says "our long term strategy is to reduce the cost of the generator set." (The memo further says, "After we have built some of the redesigned units, we can recalculate our costs with very low risk.") (Relator's Ex. 7.)

An Allison chart detailing the reduction in the number of hoses and flanges in the redesigned gen set (Relators' Ex. 250.)

The Allison Procurement Authority memorandum approved by Messrs. Krohne and Lunsford a week before ECP–C040 was submitted to the Navy and Bath Iron Works acknowledging that "This change to AG9140 shall not result in a price increase. A price reduction is anticipated subject to negotiations prior to completion of the order." (Relators' Ex. 2147.)

Mr. Krohne's report to Mr. Lunsford of his trip to GTC, written the day before submission of ECP–C040, which states "the AG9140 will have less material cost which will generate some margin to offset a production gap." (This report also says, "Since the drawings are not complete, GTC does not have an executable order and cannot determine if a production break will occur or not." and "We cannot expect GTC to identify any claim impact within sixty days of the P.O. mod for the AG9140.") (Relators' Ex. 179.)

Testimony by one of the Relators in this case that, four to five months before submitting ECP–C040, Allison and GTC reached a verbal understanding that there would be a cost reduction but not necessarily the amount. (The Relator learned this from listening to one side of telephone conversations between Paul Randall and Chris Krohne. The Relator further indicates that, "The official agreement, I believe, was reached after my termination from General Tool.") (Relator's Consolidated Memorandum In Opposition To The Motions To Review the Report and Recommendation Granting Relator's Pricing Motion for Summary Judgment By Defendants Allison Engine Company and General Motors Corporation (Doc. #421), Sanders 8/23/00 Dep. at 309–12.)

After building the AG9140 mock-up, approximately five months before submitting ECP–C040, Allison's Chief Engineer, Mr. Halsey, "guessed" that the redesigned gen set would be cheaper to build. (*Id.*, Hanson 4/19/01 Dep. at 318–19.)

While ECP–C040 was pending, Allison issued a purchase order modification to GTC stating, "The AG9130 design has changed to AG9140. A price reduction is anticipated ..." (Relators' Ex. 17.)

Relators admit that these facts establish that, at the time Allison submitted ECP–C040, it was *mapping out plans* to reduce costs by simplifying the design of the proposed AG9140 gen set and was *anticipating* a price reduction from GTC. (Relator's Memorandum In Opposition To Allison's Motion To Review the Report and Recommendation at 26.) The actions of *mapping out plans* and *anticipating* are indications that factual data was *not* available. This is, therefore, an admission that there was no factual data available at the time.

In all of the cases cited by Relators in support of their argument that Allison was required to provide cost data, the contractors either had factual production data relating to the item being procured or actual quotes in hand at the time of the price negotiation and failed to disclose such to the government. See e.g., *Appeal of Aerojet Solid Propulsion Co.*, 2000 WL 307740, 2000 ASBCA LEXIS 48 (March 17, 2000); *M–R–S Manufacturing Co. v. United States*, 203 Ct.Cl. 551, 492 F.2d 835 (1974);

*Sylvania Elec. Products, Inc. v. United States,* 202 Ct.Cl. 16, 479 F.2d 1342 (1973); *Lockheed Aircraft Corp. v. United States,* 193 Ct.Cl. 86, 432 F.2d 801 (1970). Here, there is no evidence that Allison had factual production data or actual quotes in hand regarding production of the AG9140 gen sets.

In response, and to assist in understanding what was taking place at the time ECP–C040 was being finalized, Allison identifies statements made by Allison's Program Manager Chris Krohne and Allison's Contract Administrator Joe Cauchi. In his Declaration included with Allison's Motion To Review, Krohne says:

> In May 1993, when Allison submitted ECP C040, I estimated there would be no net change in Allison's costs on the program as a result of implementing the AG9140 design. I had a gut feeling that GTC's costs of providing packaging services for AG9140s might be lower that its costs for AG9130s, and I believed Allison might eventually be able to negotiate a price reduction with GTC. At the same time, I believed that Allison's recurring internal costs associated with the AG9140 would be higher than its recurring internal costs associated with the AG9140 for some period of time, as an inevitable result of introducing a new design to manufacture. At the time that Allison submitted ECP C040, I estimated that Allison's cost savings that might materialize through a price reduction with GTC would be approximately offset by the recurring cost increases internal to Allison resulting from the redesign.

(Motion of Defendant Allison Engine Company, Inc. To Review the Magistrate Judge's Report and Recommendation Concerning Relator's Motion for Partial Summary Judgment On the Submission of Claims Relating To Recurring Costs for AG9140 Generator Sets (Doc. # 396) Ex. 24, Krohne Decl. ¶ 15.)

When asked what he recalled about the redesign following the design review meeting with the Navy, Cauchi responded:

> The Navy was very, very, very pleased with the work that [Allison engineer] Jack [Halsey] had. And I was very, very concerned what Jack had performed, because when you make those type of changes-I would be telling Chris [Krohne], I'm concerned about cost. We could really get burned on something like this, especially in the specifications arena.

(Motion of Defendant Allison Engine Company, Inc. and General Motors Corporation for Partial Summary Judgment On Claims Relating To Pricing of AG9140 Gen Sets (Doc. # 163) Ex. 23 Cauchi Dep. at 104–04.)

In summary, Relators have cited no factual cost or pricing data that Allison failed to provide. This is confirmed by Relator's own expert who could not identify any such factual data that Allison failed to provide. (Doc. # 187 Ex. 3, Agresto Dep. at 208–11.) In addition, Allison had not built any AG9140s at the time of its price agreement for ECP–C040 and the price reduction with GTC was finalized in December of 1994, which was long after Allison submitted and the Navy approved ECP–C040 on November 23, 1993.

There are no genuine issues of material fact and Allison did not have a duty pursuant to FAR 52.215–24 provide its cost data to the Government at the time ECP–C040 was finalized. Further, should such a duty have existed, Allison did not have any factual cost data to disclose. The analysis now turns to a duty allegedly arising from another provision implementing the TINA.

2. *Duty To Disclose Arising from Contractual Provisions Incorporating the Price Reduction Requirements of the TINA*

 Next Realtors argue that, even if Allison could show that the TINA did not

apply to the preparation and negotiation of ECP–C040, FAR 52.215–22 creates a duty to later disclose with which Allison did not comply. FAR 52.215–22 requires that, if any price in connection with the contract was increased by any significant amount because "data of any description" was furnished that was not accurate, the price or costs shall be reduced accordingly and the contract modified to reflect the reduction. Therefore, FAR 52.215–22 provides a remedy when a price was increased by any significant amount and where a contractor has violated its disclosure obligations under TINA by failing to disclose cost or pricing data in its possession "as of the date of agreement on price."

In this case, as previously determined, there was no change in price to the government. Therefore, FAR 52.215–22 does not apply.

FAR 52.215–22 does not create a remedy for another reason. Allison did not furnish inaccurate data regarding either its cost or the cost to the Government. As previously determined, Allison did not have, and therefore, did not furnish factual data regarding its cost before ECP–C040 was approved and Allison did provide accurate data regarding cost to the Government. Therefore, Allison did not provide inaccurate data.

Relators argue that, pursuant to FAR 52.215–22, Allison should have provided the information regarding a cost reduction to the Government after the ECP was approved and after the new contract with GTC was renegotiated. However, this is not required by FAR 52.215–22. In addition, Allison was under no contractual obligation to report its new contract with GTC at the time and, under a fixed price contract like Allison's, after the contract is awarded and the fixed price established, the contractor is entitled to keep any cost savings generated by the contractor.

*Omni Corp. v. United States*, 41 Fed. Cl. 585, 595 (1998).

Therefore, there are no genuine issues of material fact. Allison had no duty and the Government is not entitled to a remedy pursuant to FAR 52.215–22. Had such a duty existed, Allison would have had no factual data to submit at the time ECP–040 was being negotiated and Allison was not required to submit cost data that reached a factual status after the ECP was finalized. The analysis now turns to a duty allegedly arising from contractual provisions, Allison procedures and the course of dealing between the parties.

*3. Duty To Disclose Arising from Contractual Provisions Governing ECPs, Allison Procedures and the Course of Dealing Between the Parties*

Finally, Relators argue that Allison has a duty to disclose its actual cost information based on requirements in DOD–STD–480A for preparation of an ECP that requires the submission of all justifying data which includes Allison's costs. Relators further argue that Allison's Standard Procedures and past practice require Allison to provide its cost information and both the United States and Allison understood that accurate cost data had to be provided with the ECP. Although Relators imply that there are multiple provisions in the Allison contract with Bath Iron Works that independently set out requirements for data submittals to support ECPs, only one has been identified, DOD–STD–480A.

■ Relators ground the argument that DOD–STD–480A requires disclosure of Allison's cost information on the provision that supporting data is to be provided with the ECP. DOD–STD–480A ¶ 4.8.7. This provision requires that formal ECPs be:

supported by all drawings and other data required to justify and describe the change and to determine its total im-

pact. Each engineering change ultimately should be evaluated by appropriate testing. The results of such testing as has been completed by date of ECP preparation should be presented in the supporting data, since such test data may be vital to the decision regarding acceptance of the change.

*Id.* 480A further defines data as:

*Data (technical data and other information).* The means for communications of concepts, plans, descriptions, requirements, and instructions relating to technical projects, material, systems, and services. Those may include specifications, standards, engineering drawings, associated lists, manuals, and reports, including scientific and technical reports; they may be in the form of documents, displays, sound records, punched cards, and digital or analog data.

*Id.* ¶ 110.16.

These two requirements, when read together and with the remainder of the requirements whereby cost information must be included elsewhere in the ECP, indicate that the supporting data that is required is engineering and testing data and is not cost data. The cost data is included elsewhere in the ECP. In addition, as determined hereinbefore, the cost asked for on the ECP refers to cost to the Government and not cost to the contractor. Paragraph 4.8.7 of DOD–STD–480A does not require the submission of the contractor's cost data.

The second document that Realtors allege creates a duty to provide contractor costs is Allison's internal procedures. However, Allison's internal procedures which require Allison personnel to provide various sorts of data in an ECP do not impose a binding duty upon Allison. Further, Allison's internal procedures cannot require that the ECP be completed incorrectly to include Allison's costs instead of cost to the Government.

The final source identified by Relators for a requirement that Allison provide its costs is Allison's course of dealing with Bath Iron Works. Relator's argue that Allison provided information regarding its costs with other ECPs. However, it was Allison's practice when submitting no-cost ECPs like ECP–C040 to not provide any additional cost data. (Suppl. Krohne Decl. ¶ 11.) When Allison submitted ECPs that sought a price change, Allison would provide supporting cost information and, when required, certified cost or pricing data. (*Id.* ¶¶ 12–15.)

Allison's course of dealing with Bath Iron Works will not support an FCA claim. However, if it did, there are no genuine issues of material fact and Allison's course of dealing with Bath Iron Works on other ECPs supports the finding that Allison did not have a duty to disclose its costs on ECP–C040.

Relators have not shown that Allison had a duty arising from its contract, its procedures or its course of dealing with the Government to provide its cost information to the Government. In addition, should such a duty have existed, Relators have not shown that Allison had factual cost information to provide at the required time. There being no genuine issues of material fact, Relators are not entitled to summary judgment on their claim against Allison regarding a failure to provide complete, accurate, and current cost information. Further, Allison's argument that Relators should not be permitted to assert any claims based on alleged failures to disclose in violation of the TINA need not be addressed.

## SUMMARY

There are no genuine issues of material fact and Relator's are not entitled to judgment as a matter of law on their claim that Allison is liable under the FCA for its false

representations as to its recurring costs on the model AG9140 gen set and for its failure to provide complete, accurate and current information regarding those costs. Allison did not make a false claim on ECP–040 regarding costs of the AG9140 gen set.

Further, Relators have not shown that Allison had a duty arising from its contract, its procedures or its course of dealing with the Government to provide its cost information to the Government. Had such a duty existed, Allison would have been required to provide only its factual cost data at the time ECP–C040 was being negotiated and approved. However, there is no evidence that Allison had factual cost data at that time.

In a separate motions, Allison and General Tool Company have moved for summary judgment on claims based upon the claim addressed herein. (Doc. # 163, # 173.) The findings herein are applicable to and used in this Court's review of the Magistrate's Report and Recommendations regarding those Motions.